IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION - COLUMBUS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff<br><br>vs.<br><br>MICHAEL SAYEGH,<br><br>Defendant | Case No. 2:21-cr-172<br><br>Chief Judge Algenon L. Marbley |

## UNITED STATES' SENTENCING MEMORANDUM

The United States submits this memorandum to set forth its position as to the appropriate sentence to be imposed on Defendant Michael Sayegh ("Sayegh"). Sayegh previously pleaded guilty to one count of Health Care Fraud. *See* Dkt. No. 105. His sentencing hearing is scheduled for June 14, 2024 at 9:45 a.m. As explained below, the Government respectfully recommends Sayegh be sentenced to (a) probation for a term of two years with a condition of home detention for a period of 8 months, (b) pay restitution in the amount of $244,541, and (c) forfeit $145,840.

**I. INTRODUCTION**

On February 9, 2024, Sayegh entered a guilty plea to Count 14 of the Superseding Indictment pursuant to a plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(A) and (B). *See* Dkt. No. 83 (hereinafter, the "Plea Agreement"). Count 14 charges Sayegh with Health Care Fraud, in violation of 18 U.S.C. § 1347. *See* Dkt. No. 43 at 12–13, ¶¶ 46–50. The Plea Agreement contemplated a total offense level of 13 under the U.S. Sentencing Guidelines ("U.S.S.G.") manual then in effect, or a level of 11, if the Court were to apply U.S.S.G. § 4C1.1 at the time of sentencing, *See id.* at 4, ¶ 6.f. The Presentence Investigative Report ("PSR"), Dkt. No. 108, provides that defendant has zero criminal history points. *See* PSR at 12, ¶ 49. Accordingly, applying U.S.S.G.

§ 4C1.1 results in a total offense level of 11.  The advisory guidelines range for a total offense level of 11 and a Criminal History Category of I is eight to fourteen months' imprisonment.

Consistent with an offense level in Sentencing Zone B, the Government respectfully recommends that this Honorable Court sentence Sayegh to probation for a term of two years with a condition of home detention for a period of 8 months.  *See* U.S.S.G. § 5C1.1(c)(3).  Consistent with the Plea Agreement, the Government also recommends that Sayegh be ordered to pay restitution in the amount of $244,541 and to forfeit of $145,840.  For the reasons outlined below, this sentence is sufficient, but not greater than necessary, to meet the ends of justice.

## II. OFFENSE AND RELEVANT CONDUCT

From at least on or about January 1, 2015, and continuing through at least in or around March 2020,  in the Southern District of Ohio, and elsewhere, Sayegh, aiding and abetting, and aided and abetted by others, knowingly and willfully executed, and attempted to execute, a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in 18 U.S.C. § 24(b), that is, the Medicare program ("Medicare") and Ohio Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services.  Plea Agreement at 10, para. 2; Superseding Indictment at 12–13, ¶¶ 46–50.

Sayegh was a licensed medical doctor in Ohio.  PSR at 7, ¶ 17.  He was also enrolled as a medical provider with Medicare and other health care benefit programs.  Plea Agreement at 10, para. 3.

The Pain Management Clinic, LLC ("TPMC") was a medical practice that operated out of two locations: 1175 South 13th Street, Cambridge, Ohio 43725, and 7335 East Livingston Avenue, Reynoldsburg, Ohio 43068. PSR at 7, ¶ 17.  Sayegh owned and operated TPMC.  *Id.*  As the owner

and operator of TPMC, Sayegh enrolled in Medicare, among other insurance plans, in order to submit claims and seek reimbursement for certain medical and laboratory services rendered by TPMC. *Id.*

Sayegh's offense relates to the manner in which he conducted and billed Medicare for urine drug testing ("UDT"). TPMC conducted two types of UDT: qualitative (also known as presumptive) testing and quantitative (also known as definitive) testing. PSR at 8, ¶ 20. Qualitative testing identified which substances, if any, were present in a patient's urine specimen. *Id.*, ¶ 21. Quantitative testing identified how much of a particular substance was present in the provided specimen. *Id.* Medicare only reimbursed claims submitted by providers if the services and items provided were medically necessary for the diagnoses and treatment of beneficiaries. *Id.* Medicare only considered qualitative testing to be medically necessary, and appropriately reimbursable, in the treatment of chronic pain patients, provided that the qualitative testing was used in the diagnosis and treatment of Medicare beneficiaries and the need for the testing was substantiated by documentation in the patient's medical record. *Id.* Conversely, Medicaid specifically excluded from coverage, and did not consider medically necessary, "blanket orders" or routine qualitative testing of substances without individualized decision making relating to the patient. *Id.*

Sayegh leased laboratory equipment in order to directly perform qualitative and quantitative UDT for TPMC patients. PSR at 8, ¶ 23. This allowed Sayegh, and others he employed at TPMC, to bill Medicare, among other insurance programs, directly for UDT performed for TPMC patients. Superseding Indictment at 9, ¶ 37

Sayegh directed employees of TPMC to perform both qualitative and quantitative urine drug testing on urine specimens provided by TPMC patients, irrespective of any identified individualized patient need. PSR at 8, ¶ 22.

Sayegh further directed employees of TPMC to perform both qualitative and quantitative testing on the provided urine specimens despite the fact that TPMC received delayed results for both

tests. Plea Agreement at 10, para. 6. Therefore, TPMC staff received the results of the quantitative testing by the next time the patient would be seen at the practice, which negated any medical use for the qualitative urine drug tests. PSR at 8, ¶ 22.

At Sayegh's direction, TPMC employees and agents submitted false and fraudulent claims to Medicare and other health care benefit programs for qualitative urine drug testing, representing that these tests were medically necessary for the diagnosis and treatment of patients, when there was no medical necessity for the qualitative tests. PSR at 9, ¶ 24. Sayegh directed these qualitative tests to be performed for the purpose of maximizing reimbursements from Medicare and other health care benefit programs. *Id.* Sayegh also ordered TPMC employees to submit false and fraudulent claims to Medicare and Ohio Medicaid for qualitative and quantitative testing on dates when TPMC's laboratory equipment was inoperable and/or required maintenance. *Id.*

On or about July 23, 2019, Sayegh caused Medicare to be fraudulently billed $130 for a qualitative urine drug test for Medicare beneficiary K.C., as alleged in Count 14 of the Superseding Indictment. Plea Agreement at 11, para. 2.

From in or around October 2018 to in or around March 2020, Defendant caused the submission of fraudulent claims to Medicare for qualitative urine drug testing on or around the same date of service as a quantitative urine drug test. Plea Agreement at 11, para. 3. Sayegh received approximately $145,840 in reimbursement for those qualitative urine drug test claims. *Id.* The stipulated loss amount is based on these claims. *See id.* at 3, ¶ 6(b)(i).

### III. THE STIPULATED SENTENCING GUIDELINES AND APPLICABLE LOSS AMOUNT

The Plea Agreement includes stipulations as to the appropriate Sentencing Guidelines calculation. *See* Dkt. No. 83. The parties agreed in the Plea Agreement that the appropriate sentencing guidelines under the U.S.S.G. manual then in effect consisted of a base offense level of 6 pursuant to U.S.S.G. § 2B1.1(a), an 8-level adjustment because the offense involved a loss greater

than $95,000 but no more than $150,000 pursuant to U.S.S.G. § 2B1.1(b)(1)(E), and a 2-level adjustment for abuse of trust or use of a specialized skill pursuant to U.S.S.G. § 3B1.3. *See* Plea Agreement at 3, ¶ 6. The Plea Agreement contemplated a 3-level reduction in the offense level, if certain conditions were met, pursuant to U.S.S.G. § 3E1.1. *See id.* Accordingly, the Plea Agreement contemplated a total offense level of 13 or 11, the latter if Sayegh met the requirements of U.S.S.G. § 4C1.1.

Based on the PSR's calculation that Sayegh has zero criminal history points, PSR at 12, ¶ 49, the application of U.S.S.G. § 4C1.1 reduces the total offense level by 2 level and results in a total offense level of 11. The advisory guidelines range associated with offense level 11 is eight to fourteen months imprisonment.

In summary, the Government's position on the Sentencing Guidelines applicable to Sayegh is as follows:

| Description | Guideline Provision | Levels |
|---|---|---|
| Base Offense Level | § 2B1.1(a)(2) | 6 |
| Loss > $95,000 < $150,0000 | § 2B1.1(b)(1)(E) | + 8 |
| Abuse of Trust/Use of Special Skill | § 3B1.3 | + 2 |
| Acceptance of Responsibility | § 3E1.1 | - 3 |
| Zero Point Offender | § 4C1.1 | - 2 |
|  |  |  |
| **Total Offense Level** |  | **11** |

Regarding the loss amount, the Plea Agreement stipulates that the applicable loss amount is greater than $95,000 but no more than $150,000. *See* Plea Agreement at 3, ¶ 6(b)(1). The loss calculation is based on payments Sayegh received from Medicare for qualitative urine drug tests claims after he received a provider education letter from a Medicare contractor on October 23, 2018 advising him that a number of his presumptive/qualitative claims were not medically necessary. Because the loss amount is more than $95,000, Sayegh's base offense level increases by 8 levels. *See* U.S.S.G. § 2B1.1(b)(1)(E).

The PSR takes the position that the total amount of intended loss was $244,541, not the amount stipulated in the Plea Agreement. *See, e.g.*, PSR at 17, ¶ 73. The Government respectfully disagrees. Sayegh defrauded *Medicare* by submitting fraudulent claims for urine drug tests which were determined to be medically unnecessary. *See* Plea Agreement at 11, para. 3. In total, Sayegh received $145,840 in reimbursement from Medicare for fraudulent claims. *See id.* The Defendant did not admit that all of the qualitative urine drug tests he submitted to *Medicaid* and the Ohio Bureau of Workers' Compensation between October 2018 and March 2020 were fraudulent. *See* Plea Agreement at 11, para. 3. He also did not agree that these claims to Medicaid and the Ohio Bureau of Workers' Compensation constitute relevant conduct under U.S.S.G. § 1B1.3 or the applicable loss amount under U.S.S.G. § 2Bl.l(b)(l)(E). *See id.* at 3, ¶ 6(b)(i). Sayegh only agreed to *repay* Medicaid $65,890 in restitution and the Ohio Bureau of Workers' Compensation $32,811 in restitution. *See id.* at 11, para. 3; *see also* 18 U.S.C. § 3663(a)(3) (permitting restitution to be ordered "in any criminal case to the extent agreed to by the parties in a plea agreement").

Accordingly, we recommend the Court adopt the Plea Agreement's position that the applicable loss amount is greater than $95,000 but no more than $150,000.

## IV. RESTIUTION

Sayegh agrees to pay the following health care benefit programs the following amounts in restitution:

| Health Care Benefit Program | Total Payment |
|---|---|
| Medicare | $145,840 |
| Ohio Medicaid | $65,890 |
| Ohio Bureau of Workers' Compensation | $32,811 |
| **Grand Total** | **$244,541** |

*See* Plea Agreement at 5, ¶ 9; *id.* at 11, para. 3; *see also* PSR at 19, ¶ 85. These amounts reflect the payments Sayegh received for qualitative UDT from in or around October 2018 to in or around March 2020.

## V. FORFEITURE

The criminal forfeiture provision applicable to Federal health care fraud offense provides that "[t]he court, in imposing sentence on a person convicted of a Federal health care offense, shall order the person to forfeit . . . gross proceeds traceable to the commission of the offense." 18 U.S.C. § 982(a)(7). "Gross proceeds" includes all the money the defendant received, without deducting expenses or amounts paid to others. *See, e.g., United States v. Bikundi*, 926 F.3d 761, 792 (D.C. Cir. 2019) (observing that, under § 982(a)(7), gross proceeds "include the total amount of money brought in through the fraudulent activity, with no costs deducted or set-offs applied") (quotation marks and citation omitted).

The gross proceeds Sayegh obtained as a result of the offenses of which he was convicted is equal to the Medicare reimbursements he received by submitting fraudulent claims for medically unnecessary qualitative urine drug tests between approximately October 2018 and March 2020. *See* Plea Agreement at 11, para. 3. In total, Sayegh received $145,840 in reimbursement for such fraudulent Medicare claims. *See id.*

## VI. APPLICATION OF 18 U.S.C. § 3553(A)

Under § 3553(a), "[t]he Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). Those purposes are "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2). In determining that sentence, this Court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), "the kinds of sentences available," § 3553(a)(3), the Guidelines and Guideline range, § 3553(a)(4), the Guidelines' policy statements, § 3553(a)(5), "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," § 3553(a)(6), and "the need to provide restitution to any victims of the offense," § 3553(a)(7).

Here, for the reasons outlined below, the United States respectfully submits that a sentence of probation for a term of two years with a condition of home detention for a period of 8 months is sufficient, but not greater than necessary, to comply with the purposes of 18 U.S.C. § 3553(a).

### A. The Nature and Circumstances of Sayegh's Sentence Warrant the Recommended Sentence

Sayegh's criminal conduct was not a brief lapse of judgment, but deliberate conduct that took place over a year. Sayegh's patients came to him expecting legitimate medical care, but he abused their trust and the trust placed in him as a Medicare-enrolled provider by billing for medically unnecessary and medically useless procedures. In sum, the nature and circumstances of Sayegh's crime are serious and merit the recommended sentence.

8

### B. Sayegh's History and Characteristics Offer No Mitigation

The "history and characteristics of the defendant" also support imposing the recommended sentence. 18 U.S.C. § 3553(a)(1). Sayegh reports having a "stable childhood" without abuse or neglect. PSR at 12, ¶ 50. He attended medical school, immigrated to the United States, continued his medical training, and eventually opened his own medical practice. *See id.*; *see also id.* at 14, ¶ 61.

Sayegh's crimes are not the result of limited functioning, intellect, or opportunity, unlike so many other offenders in the criminal justice system who lacked role models, opportunities, or full intellectual function. Despite these advantages and his material wealth, PSR at 15, ¶ 65, Sayegh resorted to crime to further enrich himself. In short, nothing about Sayegh's history or characteristics warrants a downward variance from her Guidelines range.

### C. The Recommended Sentence Affords Adequate Deterrence

The recommended sentence will provide adequate specific deterrence, as well as general deterrence for other medical professionals engaging in similar prescribing practices. *See* 18 U.S.C. § 3553(a)(2)(B). Deterrence, which serves to discourage others who may themselves be inclined to engage in similar criminal conduct, is an important consideration when fashioning a sentence.

With respect to specific deterrence, the recommended sentence, as well as the loss of his medical license and U.S. Drug Enforcement Administration registration, should deter Sayegh from engaging in further criminal conduct. More importantly, the recommended sentence in this case demonstrates to medical professionals that accountability through the criminal justice system is real and that they risk more than their licenses by engaging in unlawful practices.

### D. Pertinent Policy Statements Favor the Recommended Sentence

The Patient Protection and Affordable Care Act ("PPACA") provides evidence of congressional intent in the area of health care fraud offenses that supports imposing a sentence within the Guidelines range. The PPACA specifically provided for increased sentences for health care fraud offenses. *See* Pub. L. No. 111-148, § 10606(a) (2010). The PPACA further required the Sentencing Commission to ensure that the Federal Sentencing Guidelines and policy statements (1) "reflect the serious harms associated with health care fraud and the need for aggressive and appropriate law enforcement action to prevent such fraud;" and (2) "provide increased penalties for persons convicted of health care fraud offenses in appropriate circumstances." *Id.*, § 10606(a)(3). Varying downward from the Guidelines range would undermine that intent. *See, e.g.*, *United States v. Saleh*, 257 F. App'x 740, 744–45 (5th Cir. 2007) (observing that district court's "non-Guidelines sentence . . . could be seen as expressing a special, lenient sentencing regime for white collar criminals").

### E. The Recommended Sentence Will Avoid Unwarranted Sentence Disparities

The recommended sentence, which is within the Guideline range and contemplated by U.S.S.G. § 5C1.1(c)(3), best serves "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Sentencing within the Guidelines range avoids "creat[ing] a potential disparity in sentence for those convicted of [the same crime] in [one state], and across the country, based on little, if anything, more than the luck of which judge is assigned to a particular case." *United States v. Goff*, 501 F.3d 250, 261 (3d Cir. 2007).

10

## VII. CONCLUSION

For the reasons set forth above, the government respectfully recommends Sayegh be sentenced to (a) probation for a term of two years with a condition of home detention for a period of 8 months, (b) pay restitution in the amount of $244,541, and (c) forfeit $145,840.

Thank you for your consideration.

                                                                                     Respectfully Submitted,

                                                                                     GLENN S. LEON
                                                                                     Chief
                                                                                     Criminal Division, Fraud Section
                                                                                     U.S. Department Of Justice

                                                          By: */s/Nicholas K. Peone*
                                                                                     Nicholas K. Peone
                                                                                     Trial Attorney
                                                                                     Criminal Division, Fraud Section
                                                                                     U.S. Department of Justice
                                                                                     970 Broad Street, Suite 700
                                                                                     Newark, New Jersey 07102

## **CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that on this 4th day of June 2024, I filed the foregoing United States' Sentencing Memorandum with the Clerk of Court, and that a true and accurate copy of the foregoing was forwarded via ECF to the Defendant's counsel of record.

                              By:    *s/ Nicholas Peone*
                                          Nicholas Peone
                                          Trial Attorney
                                          U.S. Department of Justice
                                          Criminal Division, Fraud Section